OPINION OF THE COURT
Edwin Kassoff, J.
This is a proceeding pursuant to Mental Hygiene Law article 81 brought by the New York Hospital Center of Queens to appoint a guardian for the alleged incapacitated person who has been a patient at the hospital since July of 1994. Petitioner contends that there is no medical reason for the alleged incapacitated person to remain at the hospital, which is an acute care facility, but that a guardian is necessary because of her mental condition and because of her functional limitations which result in her inability to take care of her personal needs and property management.
The alleged incapacitated person, Harriet Richman, is 37 years old and is extremely obese, weighing between 400 and 500 pounds. Although it was determined that the courthouse and courtroom could accommodate her and the hospital agreed to provide transportation to and from the courthouse for her, Richman refused to come to the hearing at the courthouse. I therefore conducted the hearing at the hospital.
Richman is moved about in an oversized wheelchair which cannot pass through most doorways. The hospital made arrangements for the hearing to take place in a conference room. However, the oversized wheelchair could not fit through the door, and Richman was assisted into the room. I person *405 ally observed as the hospital aides helped Richman out of the wheelchair, through the doorway, and into a chair about five feet from the doorway. This manuevering took approximately seven minutes.
At the hearing, I heard testimony from Laurie Weissman, a social worker, Jasmine Thomas, a registered nurse, Dr. Martin Lubin, a board-certified psychiatrist, and Richman. Having had the opportunity to listen to and observe these witnesses at the hearing, I accept the facts as set forth in the testimony of Weissman and Thomas, and accept the diagnosis and prognosis of Dr. Lubin.
I find that prior to her admission to the hospital, Richman lived in an apartment with her mother. The apartment was extremely cluttered and one could hardly get through the door. There were piles stretching from the floor to the ceiling of newspapers, furnishings and clothing. The apartment was infested with roaches and other insects and there were rat droppings visible throughout the apartment. During the summer of 1993 the building maintenance personnel refused to repair her broken air conditioner because Richman would not permit the insects to be exterminated. After Richman vacated the apartment, the exterminator had to come twice because there were so many insects in the apartment.
Because she is obese, Richman requires assistance with almost all of her daily activities. She needs assistance in: sitting up in bed, getting out of bed, moving from the bed to the bathroom, and in the bathroom, particularly with toileting procedures. Richman requires assistance in bathing, washing, and grooming, as well as in applying various ointments for her skin condition. Although in the past Richman’s mother had assisted her with her activities, when her mother became unable to assist her due to the mother’s medical condition and subsequent entry into a nursing home, it became necessary for Richman to obtain assistance from other nonfamily persons.
Richman, however, was unable to employ any aide for any length of time because Richman would complain that the aide was not helping her and the aide would state that Richman would not allow the aide to perform his or her duties. Indeed, Richman discharged eight aides in a one-week period and the situation deteriorated to where no agency would provide her with aides. As no one would provide a health care aide for Richman, Thomas was voluntarily assisting Richman prior to her entry into the hospital.
*406 While in the apartment, Richman was receiving checks from Social Security. However, she did not deposit or cash those checks and she had accumulated a year’s worth of unnegotiated checks at the time she entered the hospital. Richman also failed to make any arrangements to have the checks negotiated by others.
Richman’s landlord started eviction proceedings when she was $11,500 behind in her rent payments. Richman made arrangements for Thomas to appear on her behalf in court, and executed a power of attorney to that effect. The landlord agreed to waive the substantial arrears in the rent on condition that she would vacate the apartment.
Although Richman was admitted to the hospital in July of 1994, some seven months ago, at the time of her admission she did not need to be in an acute care setting because her treatment could have been performed on an out-patient basis. Accordingly, very shortly after Richman was admitted she was medically ready to be discharged from the hospital. However, there is no adequate discharge plan for Richman because for seven months she has refused to cooperate with the hospital staff in arriving at such a plan. Although Rich-man cannot walk any great distance independently, the hospital offered her physical therapy but she refused to cooperate in arranging such therapy. Richman very often refuses care at the hospital because it comes at an inconvenient time or she doesn’t like the particular aide. Richman later complains that she was not given the care that she had earlier refused.
Richman has also accumulated in her room at the hospital large piles of newspapers and large quantities of condiments from her meal trays. When Richman was admitted to the hospital she had numerous uncashed checks which continued to remain unnegotiated during her time at the hospital.
Initially, Richman wished to return to her apartment in the community and live with her mother. When it was apparent that this was not a viable discharge option, because her mother was in a nursing home, and because of her physical condition, Richman agreed, at least initially, to go to a nursing home. Although Richman has been rejected by a large number of nursing homes or other appropriate facilities because of her age and her size, she had been medically accepted at several nursing homes. However, when the nursing home personnel came to interview Richman, she would agree to go to the nursing home only if certain unrealistic conditions were *407 met. At the hearing, Richman expressed a desire to return to the community and produced a copy of a signed lease for an apartment.
I accept the testimony of Dr. Lubin and his diagnosis that Richman has a thinking disorder of a borderline personality. Although Richman appears competent in terms of her verbal ability, at the same time she is relatively without insight and self-destructive. Although Richman’s behavior looks like it is self-confounding, so-called passive/aggressive and infantile behavior, it is in actuality a thinking disorder. This type of behavior is often seen in people who are morbidly obese.
Richman’s behavior in yelling at persons who are assisting her or refusing care and then later complaining that the care was not provided can be indicative of that type of disorder. Richman has the ability to almost instantaneously forget that which pre-existed. At one moment she is annoyed that she has to get care, the next moment she has forgotten and says that she did not get the care, although she had confounded the care earlier in the day, and throughout it all she has the feeling of being a victim. Dr. Lubin stated that past history is the best predictor of the future, and that Richman has a history of behavior that is either self-endangering or dangerous to other people.
I find that the testimony set forth above establishes by clear and convincing evidence, pursuant to article 81 of the Mental Hygiene Law, that Richman is in need of a guardian to provide for her personal needs and property management because she is incapacitated. A functional evaluation of Rich-man reveals that she is unable to manage her personal needs. Richman is unable to walk more than a distance of a few feet without assistance, needs the aid of an oversized wheelchair, is unable to sit up in or get out of bed without assistance, and is unable to bathe or go to the bathroom without assistance. Richman was unable to keep her apartment in any semblance of a clean or sanitary condition as it was infested with insects and had rats, and was filled with large piles of clothing and newspapers. Furthermore, for months Richman did not need to be in an acute care facility such as a hospital but no adequate discharge plan could be undertaken because she refused to cooperate with those constructing the plan. Accordingly, a guardian is necessary to provide for Richman’s personal needs.
A functional evaluation of Richman reveals that she is unable to manage her property. Richman accumulated approx *408 imately one year’s worth of Social Security checks which she did not cash or deposit in a bank account. During this period she allowed over $11,000 of rent arrears to accumulate. Accordingly, a guardian is necessary to provide for Richman’s property management.
Significantly, I find that Richman has not shown the desire to have people assist her with her personal needs and property management. A person could be in Richman’s physical condition and still not be incapacitated if they have the desire and ability to work with others. For instance, it is understandable that because of her physical condition she might have difficulty cashing or depositing her checks, however, she would not allow other people to assist her either by helping her to the bank, or by allowing them to cash or deposit the checks.
I find that Richman lacks an understanding and appreciation of the nature and consequences of her functional limitations and it is likely that she will suffer harm because of that lack of understanding. I appoint Jasmine Thomas, whom Richman agreed to have as one coguardian, and as the other coguardian, I appoint TOUCH, Inc., as Thomas indicated that she would not serve without a coguardian.
The coguardians shall have the following property management powers:
1. Collect all income, including but not limited to Social Security, dividends, interest and pension;
2. Endorse, collect, negotiate, deposit and withdraw Social Security, Veterans Administration, and/or other pension, annuity or benefit checks and/or negotiable instruments;
3. Apply for government and private benefits on behalf of the alleged incapacitated person;
4. Deal with Medicare and Medicaid claims, litigation and settlements;
5. Claim, negotiate, obtain and settle claims and actions for government entitlements and benefits of all kinds with all government administrations and agencies;
6. Deal with all pension, retirement incentive, I.R.A./ Keogh/SEP and similar type plans, programs and annuities;
7. Sign tax returns and deal with all Federal, State, and local tax authorities on all claims litigation, settlements and other matters;
8. Marshall the alleged incapacitated person’s assets, and *409 invest and reinvest such assets as a prudent person of discretion and intelligence in such matters seeking reasonable income, and to apply so much of the income and principal as is necessary for the alleged incapacitated person’s comfort, support, maintenance and well-being;
9. Lease a primary residence for up to three years;
10. Buy and sell stocks, bonds and Treasury bills;
11. Make statutory claims and elections;
12. Implement and make tax savings decisions;
13. Retain attorneys, accountants, investment counsel and similar professionals concerning the alleged incapacitated person’s property and affairs and to pay the same subject to the court’s approval of such fees;
14. Handle all banking transactions;
15. Apply for, pay and handle all claims and settlements including insurance transactions;
16. Handle estate transactions;
17. Defend or maintain any civil judicial proceeding;
18. Access confidential financial records, reports and statements;
19. Access safe-deposit boxes/vaults/safes;
20. Provide for the alleged incapacitated person’s maintenance and support.
The coguardians shall have the following personal needs powers:
1. Employ and pay household help and health aides;
2. Transfer the alleged incapacitated person to an adult residence, skilled nursing facility or other similar type of facility, when it is unreasonable under the circumstances to maintain the alleged incapacitated person in the community;
3. Make decisions regarding general environment and other social aspects of the life of the alleged incapacitated person;
4. Determine whether the alleged incapacitated person should travel;
5. Consent or refuse generally accepted routine or major medical or dental treatment;
6. Change the alleged incapacitated person’s abode;
7. Access and disclose medical and confidential records;
8. Provide the alleged incapacitated person with personal health care services from others.
These powers are determined to be the least restrictive form *410 of intervention consistent with Richman’s functional limitations and the likelihood of harm because of her inability to adequately understand and appreciate the nature and consequences of her functional limitations.
Many nursing homes refused to accept Richman as she placed unreasonable and unrealistic conditions that they could not comply with. The coguardians shall not have to comply with these conditions. Taking into consideration Richman’s age and her physical and medical condition, it would be more appropriate if her coguardians could place her in an adult home or an assisted living facility, instead of a nursing home.
Although Richman cannot now be placed in a private residence as she requires an oversized wheelchair which cannot fit through a normal doorway, when the time comes that Rich-man will accept aides to help her function, and a residence that can accommodate an oversized wheelchair is available, the coguardians should consider placing her in such a private residence.
The court, as a last resort, appoints a guardian for Rich-man, not because of her functional limitations, but because she would not accept any help from aides to take care of her personal needs and property management.
I waive the requirement that the coguardians must file a bond.